UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 3:21-CR-141-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| JAVIER ALEJANDRO CEJA-TORRES, | ) | **ORDER ADOPTING MAGISTRATE** |
| et al., | ) | **JUDGE'S FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW, AND** |
| Defendants. | ) | **RECOMMENDATION** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Findings of Fact, Conclusions of Law, and Recommendation ("R&R") filed by United States Magistrate Judge Regina S. Edwards. [R. 46]. The R&R addresses the Motions to Suppress Evidence filed by Defendants Javier Alejandro Ceja-Torres, [R. 20], and Jose Angel Cardenas-Rodriguez, [R. 30]. In her R&R, Judge Edwards recommends that the Defendants' Motions be denied. [R. 46, p. 13]. Ceja-Torres timely filed Objections to the R&R. [R. 51]. The United States responded, stating no objection to the R&R, and urging the Court to deny Defendants' Motions. [R. 52]. For the reasons set forth below, the Court overrules Ceja-Torres's objections, [R. 51], adopts the Magistrate Judge's R&R, [R. 46], and denies Defendants' Motions to Suppress, [R. 20; R. 30].

## I.  BACKGROUND

On November 3, 2021, a grand jury returned a four-count indictment detailed as follows: Count I charges Ceja-Torres with Reentry After Deportation/Removal in violation of 8 U.S.C. § 1326(a); Count II charges Cardenas-Rodriguez with Reentry After Deportation/Removal in violation of 8 U.S.C. § 1326(a) and (b)(1); Count III charges both Ceja-Torres and Cardenas-

- 1 -

Rodriguez with Conspiracy to Possess with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A); Count IV charges both Ceja-Torres and Cardenas-Rodriguez with Conspiracy with Intent to Distribute Cocaine; and a notice of forfeiture. [R. 1, pp. 1–3].

On April 11, 2022, Ceja-Torres filed a Motion to Suppress Evidence and Request for Hearing Thereon. [R. 20]. In his Motion, Ceja-Torres requests "an order suppressing the use at trial of any evidence directly or indirectly obtained as a result or consequence of an illegal search and seizure of his person and the automobile he was operating on or about September 21, 2021." *Id*. at 1. The United States responded in opposition to Ceja-Torres's Motion. [R. 21]. On May 2, 2022, the Court entered an Order referring the Motion to the Magistrate Judge for a hearing, if necessary, and a report and recommendation. [R. 22]. On May 31, 2022, co-Defendant Cardenas-Rodriguez filed a Motion to Suppress Evidence and Join Hearing, which raises the same arguments as those in Ceja-Torres's Motion. [R. 30]. The Court likewise referred Cardenas-Rodriguez's Motion to the Magistrate Judge. [R. 31].

The Magistrate Judge held a suppression hearing on June 17, 2022. [R. 34]. During the hearing, Judge Edwards heard testimony from Trooper Ethan Whitlock ("Trooper Whitlock") of the Kentucky State Police ("KSP")—the officer who conducted the stop and automobile search at issue. *See* [R. 37]. The Court has independently reviewed the transcript of the suppression hearing in its entirety. Trooper Whitlock described that on the relevant date, September 21, 2021, he observed the vehicle "northbound on Interstate 65 in Elizabethtown, Kentucky, around the 91 mile marker." *Id*. at 4. He initially noticed that the vehicle had "heavy window tint on the back windows, light window tint on the front windows, and [a] license plate frame around it that said 'Princess.'" *Id.* at 4. Trooper Whitlock testified that the license plate frame was "covering a portion of the

[vehicle's] registration sticker." *Id.* at 29. Trooper Whitlock observed that, when the operator of the vehicle noticed police presence, the vehicle dropped in speed to under the posted speed limit before making a lane change and exiting the interstate. *Id.* at 4–5. Trooper Whitlock testified that he attempted to slow to make a traffic stop but was unsuccessful, so he turned the vehicle around and came back to attempt to catch up with the vehicle. *Id.* at 5. Before he saw the vehicle a second time, Trooper Whitlock ran the license plate number of the vehicle through a DEA database and discovered that the vehicle likely originated in Arizona two days earlier and made numerous cross-country trips over the course of that same month. *Id.* at 5–6.

Trooper Whitlock testified that he eventually located the vehicle and, when he came up behind the vehicle a second time, he noticed it drop in speed and shift to the right lane. *Id.* at 5. At this time, Trooper Whitlock pulled over the vehicle and began to conduct the traffic stop. *Id.* at 5. Trooper Whitlock approached the driver side window and "[u]pon contact [] noticed numerous open beers in the passenger's side floorboard." *Id.* at 6. According to Trooper Whitlock, it was also "very apparent that [the vehicle's occupants] were not fluent in English." *Id.* at 7. He first attempted to engage with the vehicle's driver, Ceja-Torres, in English and, because he knew a bit of Spanish, Trooper Whitlock was able to ask the occupants for their paperwork in Spanish and "did obtain their paperwork as well as the vehicle information." *Id.* at 7, 8.  Trooper Whitlock testified that the driver did not produce a valid driver's license, and instead, the occupants each provided what appeared to be a passport, though "[i]t could have been a Mexican ID or some form, but it was some type of Mexican document." *Id.* at 8. With respect to vehicle information, Trooper did not specify the nature of the information provided at that time, but at other points in his testimony, he stated that during his subsequent questioning of Ceja-Torres, he was aware that the

vehicle was not registered to either occupant, and, "The best of my recollection, it was registered to a female out of Arizona."  *Id.* at 16, 36.

Trooper Whitlock then asked Ceja-Torres, in English, if they could speak near his police cruiser so he could use a translator on his phone to bridge the communication gap. *Id.* at 7–8. Trooper Whitlock testified that Ceja-Torres seemed to understand the request, as he exited the vehicle and walked toward the cruiser. *Id.* at 8. Trooper Whitlock and Ceja-Torres continued to converse with the assistance of Google Translate, an instant text translation application installed on Trooper Whitlock's cellphone. *Id.* at 8–9. Through his testimony, Trooper Whitlock explained that he can type questions in English into the application interface, and the application generates a Spanish translation which native-Spanish speakers can read. *Id.* at 9. He testified that he has used Google Translate on previous and subsequent occasions to help him communicate with non-English speakers, and those individuals have generally understood the translations generated by this application. *Id.* at 9. In this instance, he used this application to ask Ceja-Torres many questions including the nature of his travel and the length of his stay, to which Ceja-Torres verbally responded in English. *Id.* at 10, 24. At some point during the stop, Trooper Whitlock called another trooper to the scene to conduct a blood alcohol concentration test "due to the odor of alcohol coming from [Ceja-Torres]." *Id.* at 10.

Trooper Whitlock testified that throughout their interaction, Ceja-Torres appeared nervous and "[w]ouldn't stop pacing back and forth." *Id.* at 11, 34. To determine if this nervousness was caused by concern for the traffic violation or some other crime, Trooper Whitlock advised Ceja-Torres that he would not receive a traffic citation for the stop. *Id.* at 12. However, Trooper Whitlock observed that Ceja-Torres remained nervous. *Id.* at 15. Trooper Whitlock subsequently asked Ceja-Torres if there was anything illegal in the vehicle, to which Ceja-Torres shook his head

no. *Id.* at 11. Trooper Whitlock then asked if Ceja-Torres would consent to a search of his vehicle and its contents, to which Ceja-Torres gave a "nonverbal response of a head shake up and down which indicated yes." *Id.* at 12. The search of the vehicle began about twenty-six minutes after the initial stop. *Id.* at 22–23. Trooper Whitlock discovered controlled substances in the vehicle. *Id.* at 13. Trooper Whitlock explained that, if the occupants had not consented to the search, he would have deployed his drug detection canine who was present in his squad car and is trained to detect controlled substances. *Id*. at 36–37.

On August 8, 2022, the Magistrate Judge issued her R&R, [R. 46]. In the R&R, the Magistrate Judge considered the facts and circumstances surrounding the search to determine if Ceja-Torres' consent was voluntary, including "Ceja-Torres' age, intelligence and education; whether he understood his constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police." *Id.* at 8. She reasoned that the length and nature of Defendants' detention was not unreasonable under the circumstances. *Id.* And, importantly, the Magistrate Judge determined that:

> [T]he totality of the circumstances demonstrates that Ceja-Torres understood Trooper Whitlock's English commands and his Spanish communication facilitated by Google Translate. Moreover, even if Ceja-Torres did not understand Trooper Whitlock's request for consent, a reasonable officer in Trooper Whitlock's position would have believed he did based on the context of their interaction, including Ceja-Torres' prior verbal responses and his affirmative nod when asked for consent to search.

*Id*. at 11–12. Finally, the Magistrate Judge reasoned that, even if Ceja-Torres' consent had not been valid, the inevitable discovery exception to the exclusionary rule applies, as Trooper Whitlock would have deployed his drug detection canine if Ceja-Torres had refused consent. *Id*. at 12–13. Assuming the canine, which was specifically trained to recognize the types of drugs eventually located in the vehicle, would have alerted Trooper Whitlock to the presence of

controlled substances in the vehicle, he would have had probable cause to search the vehicle. *Id.* For those reasons, the Magistrate Judge recommends that Defendants' Motions to Suppress, [R. 20; R. 30], be denied.  *Id.* at 13.

## II. ANALYSIS

Under 28 U.S.C. § 636(b)(1)(B), a District Court Judge may designate a Magistrate Judge to submit findings of fact and recommendations on evidentiary matters. The Court must make a *de novo* determination of dispositive matters to which specific objections are made. Fed. R. Civ. P. 72(b)(3); *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). A specific objection, which preserves the issue for appeal, "explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic." *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 1997) (citation omitted). Courts need not conduct *de novo* review of general objections that fail to identify specific factual or legal issues, because it duplicates the Magistrate Judge's efforts and wastes judicial economy. *Howard v. Sec. of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Here, Ceja-Torres objects to the Magistrate Judge's R&R on several grounds.[1] Ceja-Torres challenges the finding that there was cause for reasonable suspicion that would justify Trooper Whitlock's decision to extend the stop beyond the time and scope necessary to investigate the traffic violations. [R. 51, at 5]. He challenges the finding that his purported consent to the vehicle search was knowingly and intelligently given and argues that the government failed to offer sufficient evidence that he understood the request for consent despite his language barrier. *Id.* at 1–3. Ceja-Torres objects to the Magistrate Judge's reliance on his deportation history in assessing his capacity to give knowing and voluntary consent. *Id.* at 4. Finally, he challenges the Magistrate Judge's conclusion that the inevitable discovery exception to the exclusionary rule applies and

---

[1] The Court notes that Defendant Cardenas-Rodriguez did not timely raise any objections to the R&R, and therefore, any future objections are considered waived. *Thomas v. Arn*, 474 U.S. 140, 152 (1985).

argues that the assumption that Trooper Whitlock would have been alerted to the presence of drugs upon deploying his canine for a sniff search is supported only by mere speculation. *Id*. at 2, 5. The Court reviews Ceja-Torres's objections below.

### a.  Extension of the Traffic Stop

It is undisputed that Trooper Whitlock's initial traffic stop was lawful due to the traffic violations that he observed. [R. 41, at 7]. "An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (citing *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)). However, Ceja-Torres contends that "the tolerable length of detentions ended at the time reasonably required to complete the mission of the stop, which was the issuance of a 'warning' for the alleged traffic violations . . . ." [R. 45 at 1.] He therefore argues that any unrelated questioning after that point, including the request for consent to search the vehicle, was unlawful. [*Id.* at 2–3; R. 51, at 5].

A traffic stop is analogous to an investigative detention and is generally governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *See, e.g.*, *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Applying those principles, the Supreme Court has held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350–51 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. The Supreme Court explained that

determining whether to issue a ticket and other "ordinary inquiries incident to [the traffic] stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as well as certain officer safety related tasks, are related to the purpose of the stop and do not constitute unreasonable extensions. *Id.* at 355–56 (quoting in part *Caballes*, 543 U.S. at 408 (alternation in original)). "On-scene investigation into other crimes" is not related to the original mission of a traffic stop. *Id.* at 356. Thus, while an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop[,] . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355.

Here, the Parties agree that Trooper Whitlock's inquiries following his indication to Ceja-Torres that the traffic violations would result in no more than a warning extended the stop beyond its pretextual purpose and were therefore subject to the reasonable suspicion requirement under *Rodriguez*.[2] [R. 41, at 5; R. 42, at 5]. At issue is whether Trooper Whitlock inquiries were independently justified by reasonable suspicion of criminal activity. Ceja-Torres contends that the only factual basis for suspicion that Trooper Whitlock's testimony established is "various license plate 'hits' that showed that car had traveled to various cities across the country over a period of time, and his interaction with the defendant, who[m] he described as nervous." [R. 45, at 2]. Naturally, Ceja-Torres argues that these facts taken together do not establish a reasonable basis to suspect that he was engaged in a drug trafficking crime. *Id.* However, through his testimony, Trooper Whitlock established many additional facts elaborating the totality of the circumstances that gave rise to his suspicion.

---

[2] Ceja-Torres does not argue that law enforcement conduct over the twenty-five to twenty-six minutes preceding these inquiries extended the time or scope of the stop beyond what was necessary to investigate the traffic violations.

Trooper Whitlock testified that he has approximately ten years of experience working as a law enforcement officer during which time he "had the opportunity to investigate both large and small scale drug trafficking operations[.]" [R. 37, at 4]. He further testified that he received specific training related to drug trafficking crimes in the form of "numerous conferences as well as training classes in the subject matter[.]" *Id.* at 3–4. At the time leading up to the stop, Trooper Whitlock was on patrol driving along a highway when he approached a vehicle ahead of him on which he observed dark window tints and a license plate frame covering its registration sticker. *Id.* at 4–5, 28]. He observed the occupants appear to notice the presence and scrutiny of Trooper Whitlock— who was driving a marked squad car—at which time the vehicle "drastic[ally]" reduced its speed and promptly change lanes before exiting onto a different highway. *Id.* at 4–5, 21, 33. After he proved unable to effectuate a traffic stop due to his relative speed, he ran a search on the vehicle's license plate number in DEASIL, a database maintained by the Drug Enforcement Agency that catalogues vehicle location records throughout the country. *Id.* at 5–6. The search yielded three pages of results matching the vehicle's plates. *Id.* at 14, 20. Images of all three pages were introduced as exhibits to the suppression hearing, though Trooper Whitlock testified that he only looked at the first page at the time which lists the ten most recent results and shows a total result count of twenty-eight. *Id. See* [R. 44-1]. The ten results on the first page show the vehicle over an eighteen-day period move east through Texas to Georgia, return west through Kansas then Texas to Arizona, then east through Arizona and New Mexico to Texas. [R. 44-1, at 3]. Trooper Whitlock testified that in his training and experience, "it's indicative of some type of criminal activity when you're making that many cross-country trips but a few days later you're going back the opposite direction and hitting the same license plate reader." [R. 37, at 6]. Specifically, he testified that such is indicative of "drug smuggling, money laundering, human trafficking, things of that nature." *Id.*

Thus, at this point, Trooper Whitlock was aware of specific facts that he recognized to suggest potential criminal activity. As the Magistrate Judge noted in her R&R, "an officer may draw on his own experiences and make inferences and deductions that may otherwise [e]lude a layperson." [R. 46, at 9] (citing *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008)). Separately, the Sixth Circuit has considered, among other facts, vehicle location data tracking short and/or frequent trips between two interstate locations as supporting reasonable suspicion to extend a traffic stop. *United States v. Smith*, No. 19-6448, 2020 WL 7587556, at *2 (6th Cir. Sept. 2, 2020); *United States v. Davis*, 430 F.3d 345, 355 (6th Cir. 2005). *See United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016) ("[D]ubious travel plans" are often a "strong indicator[ ] of criminal activity.").

In addition to the DEASIL search results coupled with evasive driving patterns upon notice of a marked squad car, facts arising following Trooper Whitlock's pursuit of the vehicle compounded the basis for reasonable suspicion. When his marked squad car neared the vehicle a second time, he again "observed it drop in speed and shift to the right-hand portion of the lane." [R. 37, at 5]. Trooper Whitlock then effectuated a traffic stop, and throughout the twenty-five to twenty-six minutes that followed, "[d]uring the entire interaction [Ceja-Torres] appeared nervous." *Id.* at 11, 23. Ceja-Torres emphasizes that "Trooper Whitlock acknowledged that it is common for individuals stopped for traffic violations, including no operator's license, to be nervous." [R. 45, at 2]. To his point, the Sixth Circuit has made a similar observation in finding on the facts before it that "there was nothing inherently suspicious about the [driver's and passengers'] nervousness in this instance." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). Nevertheless, "[t]he Supreme Court has 'recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.' " *Shank*, 543 F.3d at 317 (quoting *Illinois v. Wardlow*, 528

U.S. 119, 124 (2000)). Here, the record shows that after Trooper Whitlock approached the parked vehicle and requested Ceja-Torres's paperwork, he observed that Ceja-Torres's "hands were shaking when he handed me the document." [R. 37, at 7]. Additionally, throughout Trooper Whitlock's questioning of Ceja Torres outside the vehicle, "[h]e continued pacing back and forth once he was out of the car in front of the vehicle. Wouldn't stop pacing back and forth." *Id.* at 34. Trooper Whitlock testified that Ceja-Torres's demeanor did not relax throughout the course of their interaction, which included his blood alcohol concentration test showing the presence of alcohol below the legal limit and Trooper Whitlock advising him that he would receive only a warning for the traffic violations. *Id.* at 10–11, 13, 21, 34. These specific facts about Ceja-Torres's demeanor indicate a level of nervousness beyond what is common for an ordinary driver at a traffic stop.   Finally, at the time that he requested consent to search the vehicle, he was aware the vehicle was not registered to Ceja-Torres nor Cardenas-Rodriguez and in fact recalled that the registered owner was a female.   Trooper Whitlock testified that in his experience and training related to narcotics investigations, smugglers commonly use vehicles belonging to other individuals "To help distance their self from whatever's in the vehicle that could be illegal."   *Id.* at 37.

While none of the individual facts discussed above compels the conclusion that Ceja-Torres was engaged in drug trafficking, in analyzing reasonable suspicion, "the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005). This analysis, "does not present a particularly high bar." *United States v. Belakhdhar*, 924 F.3d 925, 927–28 (6th Cir. 2019). Considering the totality of the circumstances, the Court finds that there was reasonable suspicion for Trooper Whitlock to extend the stop beyond the scope and time necessary to investigate the traffic violations which

justified his minimally intrusive inquiry that was limited to asking Ceja-Torres whether there was anything illegal inside the vehicle and whether he would consent to a vehicle search. The Court notes that before and after *Rodriguez*, the Sixth Circuit has repeatedly endorsed briefly extending traffic stops for similar inquiries in order to quickly confirm or dispel an officer's suspicion. *See, e.g., United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016); *Calvetti*, 836 F.3d at 667; *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998); *United States v. Palomino*, 100 F.3d 446, 450 (6th Cir. 1996). The Court recognizes that Trooper Whitlock testified that he intended to further extend the stop in time and scope if he was unable to obtain Ceja-Torres's consent. [R. 37, at 36]. The Court need not determine whether such further extension would have been warranted because, "[w]here a law enforcement officer is granted permission, execution of the search does not impermissibly extend the duration of the traffic stop." *United States v. Reyes-Martinez*, No. 1:17-CR-00035-GNS-2, 2020 WL 7379141, at *3 (W.D. Ky. Sept. 25, 2020), *report and recommendation adopted*, No. 1:17-CR-00035-GNS-2, 2020 WL 6820800 (W.D. Ky. Nov. 20, 2020) (citing *United States v. Burton*, 334 F.3d 514, 518 (6th Cir. 2003)); *see also United States v. Downer*, No. 3:21-CR-67-RGJ, 2021 WL 5163428, at *3 (W.D. Ky. Nov. 5, 2021) (citations omitted). As the Court discusses below, Ceja-Torres knowingly and voluntarily consented to the search of the vehicle preceding his arrest.

### b. Consent to Vehicle Search

"The Fourth Amendment permits a search without a warrant if valid consent to search is given." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). "The government bears the burden of demonstrating by a preponderance of the evidence, through clear and positive testimony, that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *Id.* (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009))

(internal quotation marks omitted). "The question of whether consent to a search was freely and voluntarily given 'is a question of fact to be determined from the totality of all the circumstances.'" *United States v. Meadows*, No. 6:21-CR-27-REW-HAI, 2021 WL 4782259, at *5 (E.D. Ky. Oct. 13, 2021) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). The circumstances courts should consider include "the age, intelligence, and education of the suspect; whether the suspect understands the right to refuse consent[;] the length and nature of the detention; and the use of coercive or punishing conduct by the police[.]" *Id.* (citing *Bustamonte*, 412 U.S. 218, 226). Further, "[a] language barrier is a factor to consider when determining the validity of consent." *Reyes-Martinez*, 2020 WL 7379141, at *12 (citing *United States v. Alaouie*, 940 F.2d 663 (6th Cir. 1991) "The government's burden of showing that consent was freely and voluntarily given is heavier where it appears that the suspect is illiterate or a foreigner who does not readily speak and understand English." *United States v. Hernandez*, 224 F. Supp. 2d 1156, 1159 (W.D. Tenn. 2002) (citing *Kovach v. United States*, 53 F.2d 639 (6th Cir. 1931)).

Here, Ceja-Torres's central argument is that the United States has not offered sufficient evidence to establish that Trooper Whitlock's "request for consent to search was effectively communicated" in light of his language barrier. [R. 45, at 3]. "'In determining whether an individual has sufficient comprehension of English to provide voluntary consent, courts examine his ability to interact intelligently with the police.'" *United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2005) (quoting *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999)). The Sixth Circuit illustrated this analysis in *United States v. Zuniga*, 613 F. App'x 501 (6th Cir. 2015). In that case, an officer stopped a vehicle based on two traffic violations. *Id.* at 503. After pulling over the vehicle, the officer asked the driver for his license and proof of insurance. *Id.* at 503–04. The driver handed the officer proof of insurance and a Mexican driver's license with a different

name. *Id.* at 504. The officer questioned the driver about his travels, in English, and the driver answered the questions appropriately. *Id.* The officer then asked the driver "whether he had any large sums of money, drugs, or dead bodies in the truck," to which the driver responded, "no." *Id.* Then, the officer asked the driver if he could search his vehicle, and the driver said, "yes." *Id.* Appealing a district court's decision not to suppress drugs that were discovered through the vehicle search, the driver argued that his purported consent to search was invalid because he did not understand English. *Id.* at 508. The Sixth Circuit rejected his argument, explaining:

> [A]lthough Zuniga told Behnke at some point that his English was not very good, Behnke testified that Zuniga understood their conversation and responded in English to his questions—including questions asking Zuniga for his insurance and driver's license, where he was coming from and going, and the type of work that he did—and nothing in the record suggests that Zuniga was deceived or coerced into giving consent. Further, Zuniga offered no evidence at the suppression hearing contesting this evidence or suggesting that Zuniga did not fully understand Behnke's questions.

*Id.* Accordingly, the Sixth Circuit held that the district court did not clearly err "by crediting [the officer]'s testimony that [the driver] understood English when he consented to the search." *Id.*

Like the defendant in *Zuniga*, here, it appears that Ceja-Torres held a lengthy conversation with law enforcement without confusion, which was facilitated by their use of the Google Translate application. When asked about their conversation, Trooper Whitlock testified as follows:

> Q: While engaged in the conversation with Mr. Ceja-Torres via this application, what did you-all talk about?
>
> A: I asked where they were headed to, how long they were going to stay there, if they had any luggage in the vehicle that belonged to them, questions of that nature.
>
> Q: And was he able to respond to you?
>
> A: Yes.
>
> Q: Did he advise you where he was going?

- 14 -

A: They advised they were going to Lexington. They were staying until Sunday. I want to say I stopped them on like a Monday or a Tuesday, so four or five days

. . .

Q: Okay. Was he able to elaborate?

A: He stated he was going there for some type of event. I don't know if it was a birthday or work or horse racing or something of that nature, sir.

Q: Okay. So did he ever type a response in in Spanish or was it always a verbal response?

A: To the best of my recollection, it was all verbal responses, sir.

Q: To the extent he could speak English?

A: Yes.

. . .

Q: And just to clarify, this more extended conversation you're having, this is all via the application?

A: It is, yes.

Q: Okay. And when you're using this application, does it appear to you that he's understanding what you're asking him?

A: Yes.

Q: And are his responses consistent with him understanding you?

A: Yes.

*Id.* at 10, 12–14, 24.

Ceja-Torres's continued ability to provide coherent responses to the questions Trooper Whitlock asked as described above indicates that the Google Translation application facilitated effective communication between them despite the language barrier. This is consistent with Trooper Whitlock's testimony that on prior and subsequent occasions, non-English speakers

appeared to understand him through the application's translations. *Id.* 9–10. As to the request for consent, Trooper Whitlock was unable to recall the exact wording that he typed into the application software. *Id.* at 25. He testified:

> A: When I ask for consent, I make it a direct question so there's no confusion. It would have been something along the lines of "Can I search your vehicle and its contents today?"
>
> Q: And if the—so assuming the app got it right, there would be no confusion?
>
> A. Correct. Yes, sir.
>
> Q. Okay, On the other hand, if it was something like "I can search the contents" or "I am going to search the contents," then of course there could be confusion if the app gets it wrong?
>
> A. If I would have worded it like that, yes, but I make it a direct question so it alleviates all the confusion in the translations.

*Id.*.

After reading the translated request for consent, Ceja-Torres nodded his head in the affirmative. *Id.* at 13. Trooper Whitlock's description of the exchange supports a finding that Ceja-Torres knowingly and voluntarily consented to the search. *See Valdez*, 147 F. App'x at 596 (defendants compliance with officer's directions and appropriate responses in English to questions "demonstrate that Valdez understood English well enough to give consent"); *United States v. Wilson*, 806 F. App'x 450, 453–54 (6th Cir. 2020) (finding that a defendant consented to a pat-down search for weapons by nodding his head and putting his hands behind his back); *see also Reyes-Martinez*, 2020 WL 7379141, at *12 (finding that a non-English-speaking defendant validly consented to a search by nodding his head).

Ceja-Torres argues that Trooper Whitlock's testimony is not sufficient to establish that the request to search was communicated effectively because there is no way to verify the accuracy of the application's translations. [R.41, at 3–4; R. 51, at 2–4]. He discusses several cases in which

- 16 -

courts express skepticism about the use of translation applications to obtain consent due to a perceived risk that these applications caused meaning to get lost in translation. [R. 45, at 4–5; R. 51, at 2–3]. He suggests that these cases establish a rule requiring that the government must offer evidence corroborating the accuracy of application-generated translations in order to establish that consent obtained using such translations was knowing and voluntary. *Id.* Here, Ceja-Torres argues that, given the lack of video/audio recording of the exchange or any record of Trooper Whitlock's application translation history, the Court cannot determine whether the application properly translated the request. *Id.* at 5–6. The Court notes that while not binding on this Court, the cases he cites provide useful analyses of the benefits and limitations of instant translation applications. He primarily relies *United States v. Cruz-Zamora*, 318 F. Supp. 3d 1264 (D. Kan. June 5, 2018), and *United States v. Ramirez-Mendoza*, No. 4:20-CR-00107, 2021 WL 4502266 (M.D. Pa. Oct. 1, 2021).

*Cruz-Zamora* involved an officer's use of Google Translate to converse with a Spanish-speaking vehicle occupant and eventual request for consent to search his vehicle. 318 F. Supp. at 1266. During a hearing on the suppression of evidence discovered through the search, the defendant testified "that he had trouble understanding the questions asked" by the officer and "did not understand" that he was asking permission to search his vehicle. *Id.* While the defendant did exit the vehicle and stand by the side of the road without objection during the search, he testified that he did not understand the question and did not know he had a choice. *Id.* at 1270. A professional interpreter who reviewed audio and video recordings of the stop, and testified that on nine different occasions, the defendant stated that he did not understand the question asked. *Id.* at 1268. In fact, the defendant expressed confusion immediately prior to the request for consent, confusingly reading the translation aloud: "it is in front of the car because I'm going to look for it

. . . How?" *Id.* at 1269. Based on these facts, the court concluded that, "[u]nlike other cases where the defendants' actions implied that they understood the officers' questions," in that case, the government had not met its burden of showing knowing and voluntary consent. *Id.* at 1270.

Similarly, in *Ramirez-Mendoza*, the Spanish-speaking defendant testified that she did not understand that an officer communicating through Google Translate intended to request permission to search her vehicle. 2021 WL 4502266, at *3. Specifically, she argued that the request to search the vehicle was mistranslated as a statement of fact, rather than a question. *Id.* at *5. In ruling on her motion to suppress, the court explained that the exchange was facilitated through the Parties' dictation recorded by the Google Translate application, which generated and played audio verbalization of Spanish and English translations. *Id.* at *3. The court reviewed a transcript of the conversation and found that it discredited the government's argument that valid consent was given. The court was particularly critical of the officer's failure to takes steps to find a more accurate method of communication even after "it became apparent that the application was periodically producing nonsensical and bizarre translations." *Id.* at *6.

Here, unlike the defendants in those cases, Ceja-Torres presents no evidence that he the application's translation caused him to misunderstand Trooper Whitlock's request. Instead, he offers hypothetical reasons why the translation *might* have been defective. For example, he argues that, due to the nature of Spanish syntax, Trooper Whitlock's request to search the vehicle could have been translated as a statement that he will search the vehicle. [R. 45, at 4–5]. He also points out that literal translations of specific words can distort the meaning in the context of a particular phrase. [*Id.*; R. 51, at 3.] However, unlike the defendants in *Cruz-Zamora* and *Ramirez-Mendoza*, he offers no evidence that such mistranslations actually occurred. *See United States v. Hernandez*, 443 F. App'x 34, 41 (6th Cir. 2011) (finding on review of a district court's denial of suppression

motion "speculation as to the use of an incorrect dialect, and what might have been said, does not demonstrate clear error"). Moreover, the evidence in the record discredits Ceja-Torres's theory. Trooper Whitlock testified that throughout their exchange, he used the translation application to prompt Ceja-Torres with many successive questions, in response to which Ceja-Torres articulated appropriate verbal responses in English. It is also worth noting that Trooper Whitlock "know[s] a little bit of Spanish" and was able to effectively request Ceja-Torres's paperwork and for him to exit the vehicle verbally in Spanish. [R. 37, at 7]. Additionally, when questioned about how the wording of an English phrase affects whether it is translated as a statement rather than a question, Trooper Whitlock explained, "I make it a direct question so it alleviates all the confusion in the translations." *Id.* at 26. Trooper Whitlock testified that in response to the translated request for consent to search the vehicle, Ceja-Torres nodded affirmatively, which is conduct universally understood to convey a "yes" in the context of a "yes or no" question.  There is no indication in the record that at the time Trooper Whitlock began searching the vehicle, Ceja-Torres was confused, surprised, or expressed any objection—facts that would suggest that he didn't realize what he had agreed to. The Court recognizes that Ceja-Torres was not informed of his right to refuse consent, that is but one factor in analyzing the totality of the circumstances. *See* [R. 51, p. 4]; *see also Reyes-Martinez*, 2020 WL 7379141, at *12 (quoting *Bustamonte*, 412 U.S. at 227) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent."). Importantly, as the Magistrate Judge noted in her R&R, it is apparent that Trooper Whitlock "used no coercive or punishing conduct throughout his encounter with the Defendants." [R. 46, p. 9]. Rather, the Trooper Whitlock's uncontested testimony indicates that he worked diligently to ensure that Ceja-Torres could understand his questions. *See id*. The Court appreciates the pitfalls of instant

translation technology that Ceja-Torres cites and by no means endorses cellphone applications as a model for accommodating language access in policing. However, he cannot rebut the forgoing strong evidence that Trooper Whitlock's request to search the vehicle was effectively communicated and understood with mere speculation about potential miscommunication. *See United States v. Hernandez*, 443 F. App'x 34, 41 (6th Cir. 2011); *Zuniga*, 613 F. App'x at 508; *see also Reyes-Martinez*, 2020 WL 7379141, at *14–15 ("Notably, while Martinez testified that he did not speak English, he did not testify that this language barrier prevented him from understanding Trooper Ranieri's request for permission to search the car or that his consent was not voluntarily."). Given the totality of the circumstances surrounding the request to search the vehicle and the lack of evidence of actual confusion caused by any mistranslation, the Court finds that the United States has offered clear and positive testimony sufficient to meet its burden of proving by the preponderance of the evidence that Ceja-Torres knowingly and intelligently consented.

### c. Remaining Objections

Ceja-Torres "objects to the inclusion of the Magistrate [Judge]'s speculation that Mr. Ceja-Torres has been in and out of the United States for 13 years, and has been deported on four occasions."[3] [R. 51, at 4]. He argues that this information should not have been considered in determining whether his consent was knowing and voluntary as it was not a part of the record at the time of the hearing and does not bear on his ability to understand English. *Id.* Ceja-Torres also objects to the Magistrate Judge's application of the doctrine of inevitable discovery and her conclusion that absent valid consent, Trooper Whitlock would have discovered the evidence at

---

[3] In Kentucky, the office of "magistrate" is an elected non-judicial position of local county governance. The Judicial Improvements Act of 1990 designated the judicial office of the federal court as that of "United States Magistrate Judge." *See* 28 U.S.C. § 631.

issue after a lawful canine sniff which would have supplied probable cause to search the vehicle. *Id.* at 5.  In light of its analysis above, the Court does not reach these issues.

## III.  CONCLUSION

For the reasons set forth above, the Court agrees with Judge Edwards' well-reasoned R&R. Accordingly, the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.  The Magistrate Judge's Findings of Fact, Conclusions of Law and Recommendation, [**R. 46**], is **ADOPTED** as the opinion of this Court to the extent that it is consistent with this Memorandum Opinion and Order.

2.  Defendant Ceja-Torres's Objections [**R. 51**] are **OVERRULED**.

3.  The Motions to Suppress Evidence filed by Defendants Ceja-Torres and Cardenas-Rodriguez, [**R. 20; R. 30**], are **DENIED**.

This the 17th day of October, 2022.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY